IN THE UNITED STATES DISTRICT COURT
OF THE SOUTHERN DISTRICT OF FLORIDA

MIAMI DIVISION

CASE NO.: 10-21650-CIV-MORENO/TORRES

CHARLENE I. JOHNSON,

        Plaintiff,

v.

ROYAL CARIBBEAN CRUISES, LTD.,
a Liberian Corporation,

        Defendant.

_____/

## AFFIDAVIT OF JAMES M. WALKER

STATE OF FLORIDA      )
                       ) ss:
COUNTY OF MIAMI-DADE  )

        BEFORE ME, the undersigned authority, personally appeared, James M. Walker, who after being first duly sworn, deposes and states:

        1.     My name is James M. Walker and I am an attorney licensed to practice law in the states of Florida and Louisiana.  I am a partner in the law firm of Walker & O'Neill P.A.

        2.     This affidavit is based on my personal knowledge and belief.

        3.     I practice exclusively in the field of maritime law in general, and cruise line litigation in particular.

        4.     I am a 1980 graduate of Duke University and a 1983 graduate of Tulane School of Law.  I have practiced personal injury and maritime law for the past twenty-seven years.  I have been a member of the Maritime Law Association since 1984.

5.     From 1983 through 1987, I represented defendants in personal injury and maritime litigation in New Orleans, Louisiana. In 1988, I began working at the Fowler White law firm here in Miami. In 1995, I joined Blackwell Walker and worked there until the firm closed in October, 1996. While working at these firms, I handled the defense of personal injury cases, including cruise line litigation involving passenger and crew members. I represented a number of cruise lines and maritime companies, including Carnival, Dolphin, and Majesty cruise lines, as well as Ulysses Cruises, Apollo Ship Chandlers and Majestic Ship Services. I represented the interests of these companies' maritime underwriters as well.

6.     After the demise of the Blackwell Walker law firm, I created my own firm and continued with the defense of cruise lines in personal injury and wrongful death litigation. In the late 1990's, I decided to "switch sides" and begin representing passengers and crew members. I returned all of my defense files to the cruise lines and began representing mostly injured passengers and, later, crew members.

7.     Over the past decade, I have represented several hundred clients in litigation against Miami-based cruise lines. The majority of my cases have been against Royal Caribbean Cruises, Ltd. and its subsidiary, Celebrity Cruises (hereinafter "Royal Caribbean"). I have represented approximately 250 clients against Royal Caribbean over the past ten years or so in a wide variety of claims and lawsuits.

8.     The litigation I handle against Royal Caribbean includes claims by both crew members and passengers. The crew member cases typically involve claims asserted on behalf of waiters, cleaners, or stateroom attendants who are injured due to repetitive lifting. The cases involve

2

orthopedic injuries to the crew members' necks, shoulders, wrists, and lower back.  Other typical cases involve accidents where a crew member is injured.  Slip and falls in the galleys and dining rooms are a common type of accident which I handle.  The crew member cases often involve issues regarding the timeliness and adequacy of the medical care on the cruise ship and in foreign ports of call where the cruise lines disembark its crew members.

       9.     The passenger claims involve a wider variety of circumstances.  The "garden variety" case involves a passenger falling on a wet deck or slipping on liquid by the buffet.  Other typical cases involve the medical negligence of the ship doctor and injuries sustained during shore excursions.  Even though they may be "typical" cases with similar legal issues, each case turns on its own facts.  I have also represented clients in cases involving  shipboard crimes or the disappearance of a passenger or crew member.  I have handled approximately seventy sexual assault cases involving women and children, with the majority of the incidents occurring on Royal Caribbean cruise ships.

       10.    In the past five years, I have represented five passengers during Congressional hearings in Washington D.C. regarding cruise ship safety issues.  There have been four hearings in the House of Representatives and one hearing in the Senate.  These hearings all involved high profile cases and all focused primarily on Royal Caribbean passengers, including the case of the "missing honeymooner" George Smith IV whose widow I represented.  I also represented several women before Congress who were raped by crew members on Royal Caribbean cruise ships.  The nature of medical procedures on the cruise ships is an issue which Congress addressed during the hearings.

3

11.     Over the course of the past decade, I have obtained extensive first hand knowledge regarding the different ways that Royal Caribbean has handled claims and lawsuits asserted against it. I have engaged in extensive discovery and have deposed numerous employees, supervisors, managers and department heads in the cruise line's shore-side risk management department.

12.     The various ways that Royal Caribbeans defended claims over the past ten years can be divided into two distinct time periods: (1) from 2000 until 2008, and (2) from 2008 to the current date.

13.     From 2000 to 2008, Royal Caribbean's handling of claims was haphazard and often chaotic. The head of the cruise line's risk management department, Lynn White, was not a lawyer. Ms. White had an accounting background and held the title of Vice President of Tax and Risk Management. Ms. White had a hands-off approach to her department.

14.     The Risk Management Department was divided into two sections, the "crew claims" section managed by Wendy Zeperniek, and the "passenger claims" section managed by Katy Yazieiyan and, later, Pamela Powell. Each department had a supervisor and a small number of claims adjusters. None of these individuals were lawyers.

15.     The claims adjusters had a limited amount of authority (around $5,000 or so) to settle a case. The supervisors had settlement authority of around $25,000, and the managers had authority of around $50,000.

16.     There were no in-house lawyers tasked with the assignment of routinely evaluating claims and approving settlements in a fair and efficient manner. Each adjuster was responsible for handling the claims of many different cruise ships. Their voice mails were often full. The adjusters,

4

supervisors and managers appeared to be over-whelmed with claims. They were non-responsive to simple requests for information and took months to respond to settlement demands. Some adjusters quit after a few months. The supervisors and managers were reluctant to resolve cases pre-suit. They routinely sent their cases to outside defense lawyers for handling, even before suit was filed. Royal Caribbean had no inside trial attorneys at all, which resulted in outside defense lawyers being assigned literally several hundreds claims and lawsuits a year.

17.    Eight law firms in Miami received the majority of the lawsuits to defend. These firms were (1) Mase & Gassenheimer, (2) Hamilton & Miller, (3) Maltzman Foreman, (4) Rodriguez, Aronson, Essington & Ross, (5) Horr, Novak & Skipp, (6) Hill, Betts & Nash, (7) McIntosh, Sawran, Peltz & Cartaya, and (8) McAlpin & Brais. The litigation styles between these law firms were often as different as night and day.

18.    Some firms vigorously defended the cases in state court for years, with the defense lawyers insisting that the passenger travel to Miami to appear for deposition and a medical examination, a second trip for a mediation, and then a third trip for trial. Some firms took numerous depositions, traveled to the passenger's state to take medical depositions, hired numerous experts, and objected to virtually all written discovery resulting in numerous hearings to the Miami-Dade County courthouse. When the cases finally settled, there were often disputes regarding the terms of the settlement agreements, arguments about the issue of confidentiality, and so forth. These cases invariably resulted in substantial defense attorney fees being incurred, often in excess of the value of the case. The cases often settled for an amount in excess of what the case could have been resolved for pre-suit.

5

19. But a similar case handled by a different law firm would often be handled completely differently and far more efficiently. Discovery would be exchanged freely. The passenger would then travel to Miami for his or her deposition and medical examination, and the case would settle at a mediation conference the following day. A standard release would be executed and the case would be resolved without undue time or expense.

20. The difference in the handling of the cases often turned on the style of the particular law firm or the idiosyncracies of the particular defense lawyers involved.

21. Royal Caribbean's claims handling procedures and responses to discovery were inconsistent during the years 2000 - 2008. My discovery requests in cruise line injury cases are often very similar. However, Royal Caribbean's responses varied greatly, again depending on the particular defense lawyer involved. For example, if I requested a copy of the cruise line's procedures for responding to a sexual assault, some defense firms would file a litany of objections and eventually state "subject to the objections, none." But in another similar sexual assault case, another defense firm would produce the sexual assault protocols without objection.

22. Royal Caribbean's organizational structure was substantially different from other cruise lines, like Carnival, which I litigated against on a regular basis. Carnival had a well-organized and responsive loss prevention department, staffed with in-house lawyers and highly organized claims handlers. Royal Caribbean was a completely different matter. With no in-house lawyers overseeing the voluminous number of lawsuits being handled by outside lawyers, and with the defense firms competing against one another and not sharing information, inconsistency, confusion and sometimes, chaos were the result.

6

23.     In the late Fall of 2007, Royal Caribbean addressed this problem by hiring an in-house lawyer from Carnival cruise line, Paul Hehir. Mr. Hehir had previously worked as an associate at one of the top defense law firms, Mase & Gassenheimer, which routinely defended Royal Caribbean and other cruise lines. I knew Mr. Hehir from other cases which I filed against Royal Caribbean when he was one of the defense lawyers assigned to the case.

24.     With Mr. Hehir's arrival at Royal Caribbean, the cruise line began to implement changes in the manner in which the cruise line responded to cases and utilized outside counsel. Royal Caribbean terminated department head Lynn White and guest claims manager Pamela Powell and demoted crew claims manager Wendy Zepernick.

25.     Royal Caribbean hired five in-house lawyers, including Mr. Hehir. The lawyers were Jeff Anderson, Amanda Jacobs, Randy Ginsberg, and Brian Probst. Mr. Anderson, Ms. Jacobs, and Mr. Ginsberg previously worked at the Maltzman Foreman law firm. Mr. Probst and Mr. Hehir previously worked at the Mase & Gassenheimer firm. I litigated numerous Royal Caribbean cases against these lawyers long before they were employed at this cruise line.

26.     I can state emphatically that from the time period from 2000 to 2008, there was no semblance that Royal Caribbean possessed any type of internal written claims handling procedures, litigation guidelines, or documentation which contained secret directives or instructions on how any particular case should be handled by Royal Caribbean's outside lawyers, or any litigation "play book,"- however it is called.

27.     After 2008, I began to deal almost exclusively with the in-house lawyers at Royal Caribbean as they began responding to claims letters and started handing all newly filed lawsuits.

7

Defense firms which I had litigated against for years began to terminate associates because of the declining number of cases being referred to outside counsel. Some of the named partners in some of these defense firms left the practice of defending cruise lines. One prominent cruise line defense firm disbanded.

28.    One of the firms used by Royal Caribbean was Rodriguez, Aronson, Essington & Ross. Most of the cases I handled against this firm were handled by Jon Aronson. I have known Mr. Aronson for over twenty years. We both represented Dolphin and Majesty cruise lines in the mid 1990's. I noticed his firm being assigned fewer and fewer of the cases which I filed. When I went to his office, I noticed empty secretarial cubicles and some empty offices. I understood that his firm began laying off associates and staff. Two of his partners left.

29.    As of the year 2009, I had only one Royal Caribbean case which was being handled by his firm, which was then known as Rodriguez & Aronson.

30.    In April 2009, I copied Mr. Hehir with a letter complimenting his transformation of Royal Caribbean's risk management department, acknowledging that

> "... *over the past year Royal Caribbean completely revamped its risk management department. It terminated many managers, supervisors and the head of its risk management department, and hired five in-house litigation lawyers. This transformation has resulted in substantially fewer cases being referred to outside lawyers, substantially less money being paid in attorney fees and litigation costs, and more cases being settled than litigated. The cases appear to settle earlier and for substantially less than the settlements in the past, without the high price attorney bills from the defense lawyers."*
> (emphasis added)

31.    In January 2010, Mr. Aronson appeared as co-counsel with me in two Carnival cruise line cases and one Norwegian cruise line case. I understand that Mr. Aronson stopped defending the

8

cruise line in September, 2009. Neither Carnival nor Norwegian objected even though he represented them in prior cases. Since then, Mr. Aronson has been co-counsel with me in approximately sixteen cases against Carnival and Norwegian cruise lines with the majority of them resolving shortly after his appearance.

32. Over the past seven months, I have had many conversations with Royal Caribbean's Director of Litigation, Paul Hehir, about Mr. Aronson appearing as co-counsel in cases against his cruise line. Mr. Hehir initiated these conversations after learning that Mr. Aronson had appeared or was intending to appear as co-counsel with me in cases against Carnival and Norwegian cruise lines.

33. Based on my research, I believe that there is no ethical prohibition against Mr. Aronson appearing as co-counsel in any cruise line cases, including Royal Caribbean matters. None of my cases involved the same or similarly related matters which Mr. Aronson had handled at Royal Caribbean.

34. At no time did our conversations ever mention the issue that there may be any proprietary litigation procedures of any type that Royal Caribbean maintained, and which had been disclosed to Mr. Aronson, and which I was not already well aware of. Indeed, the crux of our conversations was that pre-2008, the cruise line's risk management department lacked internal policies and procedures and any controls on defense attorney fees and costs.

35. The comments expressed by Mr. Hehir during our conversations fell into two categories.

9

36. First, the cruise line did not want to see any of the cruise line defense lawyers "switching sides." Mr. Hehir acknowledged this was a concern to the cruise line because Royal Caribbean was assigning substantially fewer cases to outside defense lawyers and some of them might end up suing Royal Caribbean.

37. Secondly, Royal Caribbean was upset that I had spent the past five years portraying Royal Caribbean as the poster child of corporate malfeasance in a series of high profile crime cases and unexplained disappearances involving its passengers. A quick Google search of key works like the *International Cruise Victims organization, Merrian Carver, Ken Carver, Laurie Dishman, George Smith IV, Jennifer Hagel Smith, and Angela Orlich*, with the word *cruise*, will produce hundreds of news articles about Royal Caribbean which include our clients. I had written unfavorable articles about this cruise line in my popular law blog, *Cruise Law News*.[1] The cruise line was concerned that I had published articles about the prevalence of sexual assaults against children on Royal Caribbean cruise ships. Mr. Hehir made it perfectly clear to me that if I permitted Mr. Aronson to appear as co-counsel in any Royal Caribbean case, his company would take steps to kick disqualify him irrespective of any factors set forth in Rule 4.1-9.

38. On May 18, 2010, eight months after Mr. Aronson left his prior firm and ended his relationship with Royal Caribbean, Mr. Aronson appeared as co-counsel in the case of <u>Chambers v. Royal Caribbean</u>, Miami-Dade County Case No. 09-74575 CA 13 (Judge Eeharte). This case involves a crew member who slipped in the galley while carrying a big pot of chicken. Mr. Hehir called me two days later to discuss Mr. Aronson's appearance in the case. He asked for Mr. Aronson

---

[1]http://www.cruiselawnews.com/tags/royal-caribbean

to withdraw. I informed him that I saw no factual or legal basis for Royal Caribbean to disqualify Mr. Aronson. I sent him copies of Rule 4-1.9 and the comments thereto, cases and other legal authority supporting our position. I invited him to send me any legal authority which supported the cruise line's position.

39.     Approximately one month later, Royal Caribbean filed a motion to disqualify Mr. Aronson and my firm. None of the cases or the comments to the Rule which I provided to Mr. Hehir were cited in the motion. All except one of the cases Royal Caribbean cited in its motion were old cases decided prior to the amendment of Rule 4.1-9 in 2006.

40.     Royal Caribbean's decision to disqualify Mr. Aronson and this firm was entirely strategic in nature. It had absolutely nothing to do with "confidential internal procedures" or "substantially related" matters. It was filed to serve as an example to the defense lawyers not to jump ship, and particularly not to work with a plaintiff's lawyer that had been a thorn in the cruise line's side for many years.

41.     The disqualification motion was based entirely on the affidavit of in-house lawyer, Tony Faso. Mr. Faso made various allegations about the cruise line's claims handling procedures for the years 2000 - 2008. Although Mr. Faso did not begin his employment at Royal Caribbean until some time in early 2008, he asserted that his testimony was based on his "personal knowledge." Exhibit "A".

42.     Royal Caribbean chose not to file an affidavit from its Director of Litigation, Mr. Hehir, who worked as an outside defense attorney for a period of time and would know whether a "play book" really existed.

11

43.     On July 2, 2010, Royal Caribbean moved to disqualify Mr. Aronson and this firm in this case as well as the case of Hernandez v. Royal Caribbean, Case No. 10-21636 Civ-Huck/O'Sullivan, following Mr. Aronson's notice of appearance on June 28, 2010 [D.E. 17]. Royal Caribbean's motions were essentially identical to the motion filed in the Chambers case. The motion was again based on Mr. Faso's declaration, which had been changed to reflect that it was no longer based on his personal knowledge but on his "personal review of Royal Caribbean records."

44.     Mr. Faso's declaration contains assertions which are wholly inconsistent with my first hand knowledge of prior cases and how this cruise line's risk management department actually worked from 2000 - 2008.

45.     My understanding of Royal Caribbean's risk management operations is based on work as a diligent lawyer who has pursued discovery, obtained court ordered document productions, subpoenaed witnesses, taken numerous depositions, and otherwise obtained information directly from Royal Caribbean over the past many years, long before Mr. Aronson's relationship ended with this cruise line.

### 172 "Substantially Related" Prior Cases?

46.     Mr. Faso claims that Mr. Aronson was involved in defending Royal Caribbean in 172 passenger claims which he claims  are "substantially related" to this case.

47.     This case involves a orthopedic injury, requiring surgery, sustained by a passenger who was attempting to learn to surf on the FlowRider aboard Royal Caribbean's newest cruise ship, the *Oasis of the Seas*.  The accident occurred in January, 2010, over three months after Mr. Aronson's firm disbanded.

12

48.     To my knowledge, Mr. Aronson never defended a FlowRider case. Although I know that many passengers have been injured on FlowRiders, I am not aware of a prior lawsuit against Royal Caribbean arising out of a FlowRider incident.

49.     Royal Caribbean refuses to produce the list of the alleged "substantially-related" 172 cases so that an assessment can be made exactly what these cases involved. However, it is my first hand experience that none of the prior cases I litigated against Royal Caribbean which Mr. Aronson defended are substantially related to this case.

50.     The type of cases which Mr. Aronson defended involved completely different situations, such as a passenger who alleges that he fell down a flight of stairs during rough weather and underwent back surgery (Martin v. Royal Caribbean, Miami-Dade Circuit Court Case No. 02-11456 CA 09), or a passenger who missed a step in a dark and crowded disco and underwent surgery to her elbow (Robar v. Royal Caribbean, Miami-Dade Circuit Court Case No. 03-23732 CA15).

51.     Cases like these are fact specific. These type of cases are not substantially similar much less "substantially related" to Ms. Johnson's "wipe out" on the FlowRider.

### Secret Expert Witnesses?

52.     In paragraph 7(a) of his declaration, Mr. Faso claims that the cruise line has what he calls "confidential" information regarding "which experts Royal Caribbean uses." This information is not remotely secret. It is also the type of information which a reasonably prudent plaintiff's lawyer obtains through discovery.

53.     After approximately 250 cases, it is no secret to me which experts routinely appear for this cruise line. In any orthopedic case not involving back surgery, orthopedic surgeon Dr. Jerry

Scher appears almost without exception, particularly if the case involves a shoulder injury. If the case involves back surgery, neurosurgeon Dr. Luis Pagan appears time after time. If the case involves a hand injury, Dr. Joel Levin at South Miami Hospital appears. Royal Caribbean typically retains Dr. Jesse Basadre if a defense oriented plastic surgeon is needed. If the case involves the sexual assault of a minor, Dr. Shaw - a pediatric psychiatrist - regularly appears for the defense. The liability experts who appear for the defense also fall into predictable patterns. If the case involves a slip and fall, which is the most frequent type of case I handle, the go-to defense expert used by Royal Caribbean is engineer Mark Young.

54.    Even a novice lawyer suing Royal Caribbean can readily obtain this information by serving expert witness discovery. The number of times an expert has been retained, deposed, or testified at trial is a standard part of the information required to be disclosed by the Federal Rules of Civil Procedure. This type of information is also routinely disclosed in discovery in state court pursuant to the Florid Rules of Civil Procedure.

### Secret Procedures for Providing Medical Care to Passengers and/or Crew Members?

55.    In paragraph 7(b) Mr. Faso claims that "the processes that Royal Caribbean employs to arrange for medical care to its passengers" are "confidential."

56.    This case does not involve any allegations of improper medical care provided to Ms. Johnson. As the Court is aware, cruise lines are not vicariously liable for the medical negligence of the ship doctor. Carnival Corporation v. Carlisle, 953 So. 2d 461 (Fla. 2007). Accordingly, the cruise line's procedures for medical care for its passengers are irrelevant to this case and the Court's determination of the disqualification issue.

14

57.     But beeause Royal Caribbean has argued this non-issue as a basis for disqualification, I will address the cruise line's widely known procedures for arranging for medical care for its guests and crew. I obtained this information though diseovery, depositions, and court orders as a reasonably prudent plaintiff's attorney. I obtained the written SQM guidelines, procedures, and manuals long before Mr. Aronson ended his relationship with Royal Caribbean.

58.     There is nothing secret about how this cruise line employs medical personnel on its cruise ships. I have sued Royal Caribbean on numerous occasions for medical negligence involving both passengers and crew members. Some of the cases involved situations where the ship doctors sexually assaulted passengers and crew members. I am familiar with the manner in which the cruise line hires its ship doctors and nurses. I have obtained a wide variety of documents over the years regarding the shipboard medical personnel, including ship doctor applications for employment, doctor and nurse personnel files, employment agreements, performance evaluations, audit forms, and other similar information.

59.     The manner in whieh any cruise lines provides medical care on cruise ships must be published in documents required by the International Maritime Organization (IMO). Although the IMO does not specify exactly what medical procedures must exist, the IMO requires that each cruise line maintain what is often called a "Safety Manual System" (SMS) which explain the shipboard medical processes and procedures. Royal Caribbean refers to its SMS as a "Safety Quality Manual" (SQM). It is well established that the SMS and SQM documents are done in the regular business of the cruise lines and are not work product.

15

60.    I have obtained, through discovery, dozens of Royal Caribbean SQM's over the past decade involving every aspect of providing medical care to both passengers and crew members.[2] The Royal Caribbean SQMs address the duties of the ship doctor and nurses, the protocols of providing medical care, the type of medical forms and reports which must be completed, the supplies of the pharmacy, the audits of the medical care on the cruise ship, the protocols to handle sexual assault cases, the referral of patients and crew members ashore for medical treatment, and similar issues.

61.    The medical processes which Royal Caribbean follows are also contained in certain publications by the cruise industry's trade organization, the Cruise Lines International Association (CLIA).[3]  Exhibit "C".

62.    Royal Caribbean also claims that it follows the requirements of the American College of Emergency Physicians which address the requirements of the cruise ship's medical staff and equipment.[4]  Exhibit "D".

63.    I have attended several hearings in Washington D.C.  with clients where the Congressional sub-committees addressed issues regarding the passenger medical procedures for Royal Caribbean.  I have met with representatives of Royal Caribbean cruises in non-adversarial settings where changes to this cruise line's medical procedures were discussed.  These conversations

---

[2]For example, in the <u>Chambers v. Royal Caribbean</u> case in state court where Royal Caribbean is seeking disqualification, the cruise line produced the SQM regarding the crew medical procedures on the cruise ship and ashore.  Exhibit "B".

[3]http://www2.cruising.org/industry/medical_facilities.cfm

[4]http://www.acep.org/practres.aspx?LinkIdentifier=id&id=29980&fid=2184&Mo=No

16

have led, in part, to the passing of the Cruise Vessel Security and Safety Act, which came into effect primarily because of deficiencies in Royal Caribbean medical procedures. President Obama is expected to sign this new cruise safety law this week.

64.     In addition to procedures for passenger medical care, Mr. Faso also suggests (in his declaration in the Chambers v. Royal Caribbean case) that the procedures for crew medical care are "confidential." However, there is nothing confidential about these procedures. The procedures are explained in the cruise line's SQM which are routinely produced during discovery in crew member lawsuits. In fact, Royal Caribbean already produced the SQM documents regarding medical care procedures well prior to Mr. Aronson's notice of appearance in that case. Exhibit "B". Also, this cruise line's crew medical procedures have been widely discussed in newspapers and on line articles.

65.     In November 2004, a local newspaper in Miami published an article which focused primarily on Royal Caribbean's medical procedures for its crew members. The article appeared in the *Miami New Times* and is entitled "Screwed At Sea - Cruise Lines Throw Workers Overboard When It Comes To Provide Urgent Medical Care."[5] Exhibit "E". This article has been posted on the world wide web for the past six years and is available on this firm's web site, *Cruise Law*[6], as well.

66.     I have written several articles about Royal Caribbean and its procedures of sending crew members around the world to substandard medical facilities in impoverished countries. These articles have appeared in *Cruise Law News*, a top 50 law blog in the United States, and include

---

[5] http://www.miaminewtimes.com/2004-11-11/news/screwed-if-by-sea/

[6] http://www.cruiselaw.com/images/pdf/Screwed%20If%20By%20Sea.pdf

17

"Cruise Ship Medical Care - Royal Caribbean Gives Their Crew Members the Royal Shaft,"[7] Exhibit "F"; "Titanic Dreams - Royal Caribbean Wins Worst Cruise Line In The World Award,"[8] Exhibit "G"; and "Royal Caribbean Cruises - An Epidemic of Sick, Injured & Neglected Crew Members,"[9] Exhibit "H".

67.     I routinely receive inquiries from lawyers, both in Florida and in other states, who are in the proeess of suing Royal Caribbean and ask for copies of the above mentioned SQM medical procedures, as any prudent lawyer should do.

### Secret Internal and External Factors That Increase and Decrease the Difficulty in Defending Claims?

68.     In paragraph 7(c) of his declaration, Mr. Faso vaguely refers to certain "confidential" factors of an "internal and external" nature which affect the defense of defending a claim.

69.     Over the past 250 case, I have never heard of any outside or in-house lawyer refer to any type of proprietary factors which a defense lawyer must consider in defending a Royal Caribbean claim.

70.     As a former cruise line defense lawyer who defended exactly the type of cases which I am now prosecuting, there are generally accepted issues which any prudent attorney should consider in evaluating issues of liability and damages.

---

[7]http://www.cruiselawnews.com/2009/09/articles/worst-cruise-line-in-the-world/cruise-ship-medical-care-royal-caribbean-gives-their-crew-members-the-royal-shaft/

[8]http://www.cruiselawnews.com/2009/11/articles/worst-cruise-line-in-the-world/titanic-dreams-royal-caribbean-wins-worst-cruise-line-in-the-world-award/

[9]http://www.cruiselawnews.com/2009/11/articles/crew-member-rights-1/royal-caribbean-cruises-an-epidemic-of-sick-injured-neglected-crew-members/

18

71.     A prudent lawyer will consider certain issues regarding the initial issue of liability. Does the passenger know why she fell?  If she slipped, does she know why she slipped?  If she slipped on a substance of some type, what type of substance was it?  Was it water?  Or a spilled drink?  If it was water, did she see it before she slipped?  Was the water in a location where a reasonably prudent person would expect it (i.e., by a pool) as opposed in a location where it should not be (i.e., in the middle of a dance floor).  Did the cruise line know about the danger?  If not, did the danger exist for a length of time such that the cruise should have known about it?

72.     Regarding damages, did the passenger sustain a permanent injury?  Will she experience pain and suffering in the future?  Did she undergo surgery?  Will she need surgery in the future.  What are the passenger's medical expenses and lost wages?

73.     Other commons "external" considerations include assessing the credibility of the passenger and her witnesses.  Does she make a good appearance?   What are the skills of the opposing lawyers?

74.     These type of issues are common not only to other cruise lines but to personal litigation in general.

75.     "Internal" factors may include the availability of crew members to appear at depositions or at trial.  Are they still employed?  Or did they resign?  Can they be located?  Does the cruise ship call on a U.S. port?  Is it feasible to send an engineer to the cruise ship to conduct a vessel inspection?

76.     These factors are not confidential, but are matters of common sense which any prudent lawyer would inquire into.

19

### Secret Internal Claims Handling Procedures?

77.     Mr. Faso contends, in paragraph 7(d) of the declaration, that Royal Caribbean has "internal claims handling procedures" which are "confidential" in nature.

78.     I have deposed many of the employees in the cruise line's risk management department about how the company handles claims. Whereas there are a number of written shipboard procedures to collect information on the cruise ship (as specified in the SQM), there are no written claims handling procedures for adjusters or outside lawyers.

79.     When a passenger or crew member is injured on the cruise ship, the safety officer will conduct an investigation. This is true whether the cruise line is Royal Caribbean, Carnival, or one of the smaller lines.

80.     The cruise line's SQM explains the investigation procedures. The information which is contained below was discovered by me as any diligent lawyer would do, due to my diligence and hard work, years before Mr. Aronson left his prior firm.

81.     Royal Caribbean has different procedures if the situation involves an accident or a crime. When an accident occurs, the passenger or crew member is requested to complete a statement. There are different type of statement forms for a passenger compared to a crew member. A passenger is always requested to complete a statement before they are seen by the ship doctor. The safety officer may hand the injured passenger a form and ask her to complete the form. Quite often, the safety officer gives the ship doctor the form and then the doctor requests the passenger/patient to complete the form. Many passengers mistakenly believe that the statement is part of the medical intake forms.

20

82.     For cruise employee accidents, an "Employee Injury Investigation Team" headed by a Safety Officer will conduct an investigation. An "Employee Injury Investigation Fact Sheet" is completed. Exhibit "I". "Recommended Corrective Actions" are identified. Exhibit "J". Statements of Witnesses are taken. Exhibit "K". A "Root Cause Analysis" is prepared. Exhibit "L". A "Checklist for Investigation - File Inventory" is followed which requires the investigating team to retain evidence, take photographs, collect medical records and so forth. Exhibit "M".

83.     Royal Caribbean cruise ships have a shipboard policy called the "Accident / Incident Reporting Tracking System" (AIRTS) where accident data is collected which can be transferred shore side for the cruise line to analyze. This cruise line has an "analytical department" which can input the accident (or crime) data into its database for later analysis on a shipboard or fleet-wide basis. IT or analytical employees can program the system to create matrixes and charts which reveal accident and crime trends.

84.     There are other type of reports which are also prepared in the regular course of the cruise line's basis. For example, when a crew member employed in the Food & Beverage Department is injured, the accident is tracked in a "Restaurant Ops Weekly WPS Report, "Exhibit "N," which analyzes the accident and injuries and tracks the number of such incidents on a cumulative basis.

85.     Any prudent lawyer would learn of these documents and procedures by serving a request for production and taking a corporate representative deposition. All of the adjusters have job descriptions which delineate their job responsibilities. These job descriptions have been produced during discovery in both crew member and passenger cases.

21

86.     When a claim is presented to Royal Caribbean, I have observed the following unwritten procedures which take place.

87.     For crew claims, the adjuster or supervisor will send a form letter asking for certain information to be sent to the cruise line.   Exhibit "O".   Similar type of letters are sent regarding passenger claims as well.

88.     In theory, the claims handling will work as follows: The adjusters will begin to search the "Risk Management Information System" (RMIS) program to collect information.   The adjuster will collect information from the cruise ship.   She will send an email to the cruise ship where the accident took place and ask for certain documents to be sent to the Miami office.   Photographs of the passenger, the C - Pass cards, the shipboard medical records, statements of the passenger and witnesses, the incident and/or accident reports, a print-out of the passenger's onboard purchases (including alcohol), and other similar information are sent to the Miami office from the ship, usually from the Staff Captain.   In some cases, CCTV images have been preserved and this data is collected from the vessel with the IT department's help.   The adjusters will make notes in their files and enter comments into the company's computers using the RMIS database.

89.     This data can then be studied and an assessment of the claim can be made.

90.     This type of information was obtained by this office through discovery and is a matter of common knowledge within the Miami maritime community.   Any prudent lawyer could easily obtain similar information simply by engaging in discovery.

91.     Most of the lawyers who routinely sue cruise lines in Miami are members of the Florida Admiralty Trial Lawyers Association.   The majority of the plaintiff lawyers in this group

22

were former cruise line defense lawyers from large firms or in-house lawyers for the cruise lines who switched sides. (Jack Hickey, Brett Rivkind, Michael Guiford, Julio Ayala, etc.). Unlike defense lawyers, this organization openly shares information (depositions, discovery responses, interrogatory answers, etc.) about the cruise line amongst its members. Any prudent lawyer suing a cruise line would consider joining this organization and obtaining and sharing information of the type described above.

### Royal Caribbean's Secret Approach to Settlement?

92.     In paragraph 7(e) of his declaration, Mr. Faso claims that Royal Caribbean has a confidential approach to settling lawsuits.

93.     Mr. Faso has no first hand knowledge how his cruise line settled cases before his arrival in 2008. However, it was widely known that from 2000 to 2008, Royal Caribbean had the most claims, it paid the top settlements, and it had the highest defense fees of any cruise line in Miami. But these widely known facts are probably now obsolete, because of the substantial transformation of the cruise line's risk management department starting in 2008.

94.     In the past two and one-half years, I have asserted approximately 50 claims against Royal Caribbean. Royal Caribbean's approach to settling cases is now like any of the other cruise lines that we routinely litigate against. The in house attorneys will gather the shipboard records (discussed above), review the accident reports and statements, and obtain copies of the medical records wherever the crew member is treating with a doctor. The in-house lawyers can determine whether an accident was reported and, if so, quickly determine whether the accident was witnessed and whether it is the type of incident giving rise to a liability exposure to the company.

23

95.   Royal Caribbean now has new "P & I" (Protection and Indemnity) coverage with a $100,000 self retention including settlement funds, fees and costs. This permits the in-house lawyers greater flexibility to settle cases without having to obtain prior approval from the overseas claims handlers for the P & I Club. It has been my experience that the in-house lawyers will make a good faith effort to discuss resolving cases rather than engage in protracted and expensive litigation. The exception to this general rule is that the cruise line is not interested in resolving sexual assault cases and will refer such cases to outside lawyers.

96.   There are many factors which the in-house lawyers will openly discuss while trying to reach a settlement. For example, an accident such as a slip and fall, which is reported aboard the cruise ship, and which results in an acute injury, will usually result in a higher settlement than a repetitive injury case where the crew member's injury develops over a period of time. An injury to a long term (10+ years) employee will usually result in a higher settlement than the same injury to a newly hired crew member. There are many other factors which I discuss on a regular basis with the cruise line in-house lawyers.

97.   There is nothing confidential about such issues and discussions. Any prudent lawyer would learn similar information as the case progresses through discovery toward a resolution.

### Secret Process of Identifying Potential Deficiencies in Royal Caribbean's Case?

98.   In paragraph 7(f) of his declaration, Mr. Faso claims that there is a "confidential" process which outside lawyers must utilize in determining the weaknesses of Royal Caribbean's defenses.

24

99.     In the hundreds of cases I have handled with numerous outside defense lawyers and the new in-house lawyers, there has been no hint that they are using any type of "confidential" methodology in assessing the deficiencies of their case. Every defense attorney I have litigated against uses his or her best judgment, based on their education, training, and experience to assess the strengths and weaknesses of the cases. There is nothing remotely secret about this process. At any given time, I can pick up the telephone and speak to a defense lawyer and ask what they consider to be the strong and weak points of my case. Keeping such information "confidential" would accomplish nothing. Indeed, it and would be counter-productive to a good faith discussions which are vital to resolving type of cases. Any prudent lawyer would engage in such discussions about the good point and bad points of the case.

### Secret Remedial Actions That "Should Take Place" Aboard Royal Caribbean's Vessels?

100.    The last bit of allegedly "confidential" information mentioned by Mr. Faso in his declaration, at paragraph 7(g), is "remedial actions" that "should take place" on Royal Caribbean's cruise ships.

101.    Mr. Faso mentions that "Royal Caribbean's inside counsel" allegedly mentioned something about "remedial actions" on "vessels" needing to take place. The identity of the "inside counsel" is a mystery; when the conversation allegedly took place is not articulated; the identity of the "vessels" is unknown; and the type of "remedial actions" is not even identified with the minimal particularity required pursuant to the Federal Rules of Civil Procedure for a privilege log.

102.    The problem with Mr. Faso's nebulous assertions is that this case involves a specific type of injury on a particular cruise ship, the *Oasis of the Seas*, which did not join the Royal

25

Caribbean fleet until months *after* Mr. Aronson ended his relationship with the cruise line.  Clearly, no one could have possibly discussed remedial actions about a cruise ship which was still in the shipyard when Mr. Aronson ended his service to Royal Caribbean.

### Copies of "Privileged Files, Attorney-Client Correspondence, and Confidential and Proprietary Records Which Aronson Still Possesses?"

103.    In paragraph 6 of his declaration, Mr. Faso speculates that it is "likely" that Mr. Aronson has copies of unspecified "privileged files" and "attorney-client" correspondence, as well as "confidential and proprietary" records.  In page 10 of its memoranda, Royal Caribbean alleges that "there can be no doubt that Royal Caribbean's confidential information and confidences have and will be shared with Walker . . ."

104.    These outrageous allegations rise to the level of accusing Mr. Aronson of engaging in civil theft against his former client.

105.    Mr. Aronson has not provided, furnished, transmitted, showed, or otherwise "shared" any Royal Caribbean files, correspondence, records, or information whatsoever with this office. Such reckless allegations are spurious.

### The Only Reason Aronson Was Brought Into Case Was "Inside Knowledge?"

106.    Royal Caribbean's memorandum concludes at page 10 with the accusation that:

*. . . the only reason that Aronson was brought into the suit was due to his inside knowledge; there is no other reason for him to be brought in.*

(emphasis added)

107.    In truth, the reasons why Mr. Aronson appeared in this case (as well as the 2 other Royal Caribbean cases and the 16 Carnival and Norwegian cruise lines cases) are as follows:

26

108.   My firm consists of two lawyers, my partner and spouse, Lisa O'Neill, and I.

109.   My practice is continuing to grow substantially with an increasing number of substantial cases involving serious injuries.

110.   In addition to my active litigation practice, I am engaged in various pro-bono interests and am heavily involved in assisting non-profit organizations which take time from my law practice.

111.   I need an experienced lawyer to co-counsel cases who can handle cases though the conclusion of discovery to mediation, without assistance or supervision.

112.   75% of this firm's cases involve orthopaedic and/or neurological injures and many clients have undergone or need surgery. I am interested in associating myself with a co-counsel with a complete understanding of medical issues who can take and defend medical depositions.

113.   I need a skilled litigation attorney to act as co-counsel who can try cases without assistance or supervision.

114.   I need a litigator to be co-counsel with a proven winning record and whose involvement will advance the interests of our firm and our clients.

115.   I need a co-counsel who has personal attributes which are compatible with my personality and work ethic. The person must be highly ethical, of sound moral background, and must be 100% honest and trustworthy.

116.   In response to these firm needs, I have found the following:

117.   Mr. Aronson is a highly experienced lawyer with excellent litigation skills.

118.   Mr. Aronson possesses a thorough understanding of medical issues. His father is the respected neurosurgeon, Dr. Hubert Aronson. Mr. Aronson has, perhaps, the best attorney in the

27

CASE NO.: 10-21650-CIV-MORENO/TORRES

Miami maritime bar who I have seen depose and cross examine doctors and discuss and debate complex medical issues.

119.    Mr. Aronson is a skilled trial lawyer who has tried many cases.

120.    Mr. Aronson has a winning attitude and a winning litigation record. Of the hundreds of cruise line cases I have litigated, I have lost one - to Mr. Aronson when he defended the cruise line.

121.    Mr. Aronson is honest, moral, and trustworthy.

122.    Mr. Aronson acted as co-counsel with me in approximately 16 cases against Carnival and Norwegian cruise lines before appearing in this case against Royal Caribbean. His involvement in the cases against these other cruise lines benefitted this firm and efficiently advanced the interests of our firm's clients.

123.    I consider Mr. Aronson to be a highly qualified attorney who can assist us as co-counsel in representing our firm's clients.

124.    I decided to have Mr. Aronson appear as co-counsel in this case because of his professional and personal attributes.

125.    The fact that he previously represented Royal Caribbean is irrelevant.

126.    The notion that Mr. Aronson has "inside information" and this is the reason why he appeared in this case is preposterous.

28

CASE NO.: 10-21650-CIV-MORENO/TORRES

The above 126 paragraphs are true and correct to the best of my knowledge and belief.

**FURTHER AFFIANT SAYETH NAUGHT**.

**JAMES M. WALKER**

      The foregoing instrument was acknowledged before me by JAMES M. WALKER, who is personally known to me or who has produced  *personally Known to me* as identification and did/did not take an oath.

      **IN TESTIMONY WHEREOF**, I have hereunto set my hand and seal this _23rd_ day of _July_, 2010

Notary Public _____

My Commission Expires _11/8/11_

Commission Number _DD 733070_

**Notary Seal**

BETSAIDA BENITEZ
Notary Public - State of Florida
My Commission Expires Nov 8, 2011
Commission # DD 733070
Bonded Through National Notary Assn.

29